SAMMONS BROS. CONSTRUCTION COMPANY

*v.*

ELK CREEK COAL COMPANY

(No. 10276)

Submitted January 23, 1951.   Decided March 20, 1951.

GIVEN, JUDGE, dissented.

*Estep & Chambers, St. Clair & McComas,* for plaintiff in error.

*Campbell & McNeer, C. F. Bagley, Jr.,* and *L. E. Woods, Jr.,* for defendant in error.

RILEY, JUDGE:

This is an action in assumpsit on the common counts, instituted by Sammons Bros. Construction Company, hereinafter referred to as "Sammons Bros.", against Elk Creek Coal Company, hereinafter referred to as "Elk Creek", to recover the contract price and interest thereon for stripping and loading 18,024 tons of coal, for which it is charged the defendant had failed and refused to pay. The jury found for plaintiff in the amount of $61,-833.16, which, according to the "amended statement of account", covered the principal sum sought to be recovered, less interest. To a judgment entered on the jury verdict, defendant prosecutes error.

The stripping activities involved the period from September 9, 1947, to September 17, 1948. During such time Sammons Bros. Construction Company, a corporation, was paid for 47,181 tons of coal stripped and delivered. The 18,024 tons declared on were withheld, according to plaintiff, without the latter's knowledge through alleged improper practices on the part of Elk Creek in the weighing of the coal stripped. The amended statement divided the account into five periods: (1) from September 9, 1947, to January 26, 1948, and involving 4,350.8 tons at an agreed price of $3.20 a ton, a total of $13,922.56, "said Calhoun having assigned to plaintiff all his interest in such account" (under a joint adventure contract between Sammons Bros. and L. E. Calhoun, dated October 8, 1947,

which will hereinafter be discussed); (2) from January 26, 1948, to April 30, 1948, involving 2,302 tons at an agreed price of $3.20 a ton, a total of $7,366.40; (3) from April 30, 1948, to May 15, 1948, involving 1,490.8 tons at an agreed price of $3.30 a ton, a total of $4,919.64; (4) from May 15, 1948, to June 30, 1948, involving 2,926 tons at an agreed price of $3.50 a ton, a total of $10,241.00; and (5) June 30, 1948, to September 17, 1948, involving 6,954.4 tons at an agreed price of $3.65 a ton, a total of $25,383.56. The statement carried an additional item in the amount of $15,000.00 for the construction of a truck road from the stripping area to the tipple and items for interest on the five items above.

In addition to its plea of non assumpsit, the defendant submitted a statement showing, among other things, how payments had been made on the 47,181 tons, and showing credits.

Lucian Calhoun, under an oral contract with Elk Creek, whereby the latter agreed to pay $3.20 a ton for merchantable coal on cars or in bins, had some time prior to September 9, 1947, begun the stripping and loading of certain designated coal. Due to lack of equipment and at the suggestion of John E. Davis, General Manager of Elk Creek, that some one with additional equipment should be taken in on the operation, Calhoun approached one of the Sammons brothers, and on October 8, 1947, a written joint adventure agreement was entered into, whereby Sammons Bros. and Calhoun, as an individual, were to carry on under the name of Calhoun-Sammons Coal Company. This agreement, which was signed on behalf of the corporation by L. R. Sammons, and by L. E. Calhoun, was witnessed by John E. Davis. It stated, among other things: "Elk Creek agrees to pay Calhoun $3.20 per ton for merchantable coal on cars or in bins." The listed equipment was to remain the property of each separate party pending other arrangements. Calhoun agreed, among other things, to pay for all labor and supplies or expenses incurred on and before October 9, 1947,

except certain dynamite, the agreement to take effect October 10, 1947.

By a second writing, bearing date January 26, 1948, designated as a "Contract and Bill of Sale", the joint adventure was dissolved, and Sammons Bros. therein agreed to take certain equipment held by Calhoun at the price of $4,000.00. Calhoun's interest in the business, including the entire contract rights with the Elk Creek for coal stripping were thereby conveyed to Sammons Bros., including "all work that had been done under the firm name of Calhoun-Sammons Coal Company." Sammons Bros. continued the strip mining and loading until September 17, 1948, when it quit and removed its equipment from the operation. On December 1, 1948, summons issued at the instance of Sammons Bros., commanding Elk Creek to appear on the last Monday in December, 1948, to answer "a plea In Assumpsit. Damages $100,000 * * *."

During the period of time involved in this case, Elk Creek was obtaining coal from three sources, namely, its deep mine, the "S. P. B." stripping area, and the Calhoun-Sammons stripping area. The cars of coal from the Calhoun-Sammons operation and those from the deep mine were assembled at a point outside the mouth of the mine. They were taken from that place in trips to the scales at the head house, where the loaded cars were weighed and then dumped, the coal then by means of a shoot being loaded into a bin below the head house, and from that point lowered by a monitor to the tipple where it was screened and loaded into railroad cars. Inasmuch as it was not practical to run the S. P. B. coal over the scales it was delivered direct to the bin below the head house by trucks, the capacity of which had been predetermined. All this coal was intermingled. It was screened at the tipple, the dirt and slate removed, and afterwards loaded into railroad cars. At the middle of the month, Elk Creek would get the railroad weights on the coal loaded and shipped during the previous month. To this sum the tonnage of house coal sold to employees for the same period was added, and from this total the

S. P. B. tonnage was then subtracted. The company then checked the remainder (deep mine and Calhoun-Sammons) with the weights taken at the scales at the head house during the same period. If the weights at the head house scales did not measure up to the other weights, then the tare at the scales would be increased; and, if the railroad weights were over, the tare would be reduced for the next month. It is defendant's contention that regardless of whether the mine scales weighed too light or too heavy, the coordination with the railroad weights shows that plaintiff was actually paid for all the merchantable coal it produced for the defendant.

The oral contract, upon which the stripping was done, as heretofore mentioned, was between Elk Creek and Calhoun. The latter had been advised by Elk Creek that, due to car shortage, the maximum tonnage accepted would be limited to one hundred fifty tons a day. Calhoun testified that following his first trip of coal, which was dumped, as not merchantable, he knew that a tare was being taken at the scales at the head house, and that it was to be based on the railroad weights. He testified further that he had on one occasion mentioned rather casually the tare to one of the Sammons.

Early in August, 1948, plaintiff contracted with James R. Dick and Cecil Courts, truck drivers, for haulage. These drivers were to be paid by the Sammons Bros. on the same tonnage basis as plaintiff was paid. Dick and Courts evidently kept a complete record, and according to their testimony, they were losing approximately three tons from each nine tons hauled by them. Due to this situation, Courts contacted an inspector of weights and measures of the State Department of Labor. On the afternoon of September 14, 1948, the day preceding plaintiff's withdrawal from the operation, Willie Gibbs, representing the Department of Labor, appeared and made a test of the scales at the head house.

Gibbs testified that the tare beam was used to deduct the weight of the light car, that is the empty mine car.

At the time Gibbs arrived to make the test the tare beam was set at 4,950 pounds, so that a loaded car would have to exceed that weight before the scales would register. This witness testified that the "set screw", which was then immobile, was released, and the tare beam set at zero. Then 1,000 pounds of weights were placed on the scales, which weighed 960 pounds, a discrepancy of 40 pounds. A loaded car totalling 5,000 pounds was placed on the scales, and the scales were regulated to indicate zero with a starting point of 5,000 pounds "by bringing the tare beam out." Witness applied 1,000 pounds on the loaded car and the scales registered 5,850 pounds, a discrepancy of 150 pounds. A car which weighed 5,800 pounds before the rails were freed, weighed 6,100 pounds upon the freeing of the rails, or a discrepancy of 300 pounds; a car of coal weighing 5,000 pounds when coupled, weighed 5,700 pounds when uncoupled, a discrepancy of 700 pounds. Following this he checked the weights of the mine cars in connection with tare weight which was on the tare beam when he arrived. Five empty mine cars were weighed, and their average weight amounted to 3,660 pounds each. When this figure is subtracted from the figure found on the tare beam, that is, 4,950 pounds, 1,290 pounds remained. In other words, every car would have to have more than 1,290 pounds of coal in it before any weight would register on the scales. Gibbs also found mechanical parts underneath the scales to be out of adjustment. In figuring the overall discrepancy of a loaded car weighing 6,000 pounds, Gibbs placed the cumulative loss at 500 pounds.

Gibbs testified that the "thumb screw" on the tare beam was at the time immobile and that at his request the weighman on duty secured a tool from the electrical or blacksmith shop to release the same; that the weighman, when questioned as to when the tare was last set, pointed to the wall where the figure "46" was marked, meaning 1946, and said "that is when the tare weight was set". Further the weighman told witness that the tare weight was set by the mine superintendent, Kenneth Stafford.

The witness Rice, weighman on the first shift, was replaced by Arlie Runyon about three o'clock in the afternoon. Both remember Gibbs being at the head house at that time.

Rice testified that he was dispatched to secure the tool to release the screw, and further that it was necessary to keep the screw tight. When asked if he knew who had marked the number "46" on the wall, Rice replied, "Mr. Stafford's initials to it." In answer to the question whether there was any connection between the date and the setting of the tare on the cars, he replied, "No, sir, I don't think so." He also testified that the tare was changed from time to time, and that Stafford was the one who changed it. Defendant's counsel then put the question to Rice: "Mr. Gibbs, the State weight inspector, made some statement, as I recall it, to the effect that you pointed up to this number or date on this post and said that the tare had been set on the scales in 1946 as it was when he was there and had never been changed, had been there all the time?", to which an objection was interposed but later withdrawn, whereupon the witness was asked, "Did you make any such statement to Mr. Gibbs?", the witness answering, "No, sir, he didn't ask me about no weights or anything."

Runyon, the other weighman, was asked on behalf of defendant, "Something has been said about a date 46. It's been mentioned by two or three of the witnesses for the plaintiff that there was a post there with some number or date 46 on it. Do you know what that is, did you see it?", to which he replied, "Yes, sir, that is the weight of a car", further stating that Stafford had placed the number there. He further testified, "Mr. Stafford taken over the Elk Creek Coal Company as superintendent in the last of '45 in November, and he was wondering what the weight of the cars was. He asked several of the men and nobody gave him the same answer, so he says, he would just find out for himself, and he weighed two cars himself, put the date he weighed them, the weight of

the cars, and his initials on the post." Rice was further asked, "Mr. Gibbs has told us somebody pointed up to that date, one of the weighman at work, pointed up to this column and said the tare had been set on the scales as it then was in '46 on the post, and hadn't been moved since. Did you hear any such statement", to which he answered, "No, Sir"; and, further, that he did not make any such statement to Mr. Gibbs.

H. R. Honaker, general superintendent, testified that the tare for the Calhoun-Sammons and the deep mine operations were the same, and if the railroad weight was over the weight recorded at the scales at the head house, the tare was "cut back". He stated that he never advised Sammons Bros. that Elk Creek was taking the tare. Kenneth Stafford, mine superintendent, testified that the weights at the head house were coordinated with the railroad weights in determining the tare, and that Honaker gave him the information upon which to change the tare, and that if the railroad weights "checked", Honaker would advise witness that there was "no need for any change." Stafford further stated that such tonnage as was lost in one month was recouped the succeeding month on the basis of the railroad weight. Thus from the last two witnesses it appears that monthly with the railroad weights the tare at the head house was changed.

During the period from August 9 to September 17, 1948, Dick and Courts, truck drivers, testified that 1,303 truck loads of strip coal were loaded on mine cars preparatory to being weighed on the scales at the head house. Their testimony is to the effect that each load averaged 8½ to 9 tons. On the basis of 8¾ tons a truck load, they delivered approximately 11,401 tons into mine cars. The weights, according to the record made on the scales and forwarded to the superintendent's office, totalled approximately 8,612 tons. According to this testimony the plaintiff lost 2,789 tons by virtue of the condition of the scales. Thus from the foregoing the discrepancy for the period stated averaged about 24 per cent, as against the 40 per cent upon which Sammons based his testimony.

Pending the court's action on the motion to set aside the verdict and grant defendant a new trial, the plaintiff offered, and was permitted over objection of defendant, to amend its declaration, by inserting after the statement in the last of the common counts, to-wit: "* * * also in the further sum of One Hundred Thousand Dollars ($100,000) found to be due from said defendant to the said plaintiff on account then and there stated between them; * * *", the following: "* * * and also for the further sum of One Hundred Thousand Dollars ($100,000) for work and labor, care and diligence of the said plaintiff and L. E. Calhoun, doing business as joint adventurers as Calhoun-Sammons Coal Company, before that time done, performed and bestowed in and about the business of said defendant, and for it and at its special instance and request, said L. E. Calhoun having before that time assigned to said plaintiff his interest in said sum, and no payment therefor having been made to said L. E. Calhoun, to plaintiff or to any other person or persons entitled to receive the same."

Thereafter the court overruled defendant's motion to set aside the verdict, and entered judgment thereon.

No instructions were offered by the plaintiff. The court refused defendant's instruction No. 1, a peremptory instruction in favor of the defendant; and defendant's instruction No. 2 to the effect that plaintiff cannot recover for coal alleged to have been mined and delivered, as set forth in item 1 of the amended statement of account. He gave all of the other instructions offered by defendant, namely, Nos. 6, 7, 8, and 9, to the effect that if defendants had failed to pay plaintiff for all coal, plaintiff must establish the same by a preponderance of the evidence; that although the jury believe that the scales were out of balance on September 14, 1948, yet there is no rule of law to the effect that the scales had been in such condition for any certain period of time; that it was incumbent on plaintiff to prove by a preponderance of the evidence that plaintiff or Calhoun-Sammons, or both, mined mer-

chantable coal for which defendant has not paid; that merchantable coal means such coal as at the time was ordinarily used for sale and was reasonably fitted or suitable for use by consumers; and that if the jury believe that each month the accounts were settled, then the same should be regarded as prima facie correct and conclusive and cannot be opened or corrected except on the ground of fraud, and that to establish such settlement the burden is on the plaintiff.

The declaration was based solely on the common counts, which, of course, did not set forth the purported contract of assignment from Calhoun-Sammons Coal Company to plaintiff.

Defendant challenged plaintiff's right to recover the first item of the bill of particulars, that is, the sum of $13,922.56 on two grounds: (1) That the contract of January 26, 1948, was not broad enough to include Calhoun's right to recover his share of any shortage which might be proved; and (2) that the amendment to the declaration, after the verdict of the jury did not cure the defect in the declaration.

The right to recover the sum of $13,922.56, set forth in item 1 of plaintiff's bill of particulars, is based on the alleged shortage of 4,350.8 short tons of coal, which shortage is alleged to have occurred while the stripping operation was being conducted by Calhoun-Sammons Coal Company.

Plaintiff claims that, under the agreement of January 26, 1948, it obtained from Calhoun, for the consideration of $4,000.00, the right to collect for this alleged shortage. The provision of the agreement relied upon reads: "Included also in this sale is the interest in the business *including the entire contract rights* with the Elk Creek Coal Company for coal strip mining. Also included in this sale is *all work* that has been done under the firm name of Calhoun-Sammons Coal Company." (Italics supplied).

Defendant claims that the chose in action set forth in item 1 of the bill of particulars did not pass to plaintiff

by the words "entire contract rights", because these words are limited by the words "for coal strip mining"; and that the intent of the parties was to convey the exclusive right to Sammons Bros. to conduct future operations under the contract with Elk Creek Coal Company, rather than to assign the claim for prior breaches of that contract. Thus it is asserted that the parties could not have intended by the contract of January 26, 1948, to convey the purported chose in action set forth in item 1 of the bill of particulars, as the parties at that time had no knowledge of the claimed shortage of 4,350.8 tons of coal.

With this position, however, we do not agree. The agreement, in our opinion, exhibits an overall intent of the parties that Calhoun should cease to have any interest in the contract with the defendant, Elk Creek Coal Company, and that Sammons Bros. would succeed to all rights which Calhoun had under that contract. That being so, we are of opinion that plaintiff cannot recover under the declaration before the amendment, as the common counts are applicable only to an implied contract, or to a special contract, which has been fully performed on plaintiff's part, thus giving rise to an antecedent debt. Before amendment the declaration contained all common counts in conventional form, together with the necessary allegations of defendant's promise to pay. *Danser* v. *Mallonee,* 77 W. Va. 26, 86 S. E. 895. In it plaintiff asserts an implied contract between it and defendant "for the work and labor, care and diligence of the said plaintiff before that time done, performed and bestowed in and about the business of said defendants and for it and at its special instance and request."

Under the evidence adduced at the trial, during the period in which Calhoun-Sammons Coal Company conducted the operation, in which the purported shortage of 4,350.8 tons occurred, resulting in a loss in the amount of $13,922.56, there arose an implied contract between Calhoun-Sammons Coal Company and Elk Creek Coal

Company, and, as the basis of liability was an antecedent debt, recovery could have been had in an action in favor of Calhoun-Sammons Coal Company in the amount set forth in item 1 of the bill of particulars. *Houston* v. *Mc-Neer*, 40 W. Va. 365, 22 S. E. 80. But plaintiff, in its own name, proceeded, as it had the right to do under the assignment contained in the contract of January 26, 1948, and under the provisions of Code, 55-8-9, which provides: "The assignee of any * * * chose in action arising out of contract or injury to personal or real property, may maintain thereupon any action in his own name, without the addition of 'assignee', which the original * * * contracting party, or owner of such chose in action might have brought * * *." But this section of the Code deals only with the right of an assignee to bring suit or action in his own name, so we say that under the statute this action was properly brought, notwithstanding only a part of the amount sought to be recovered came to plaintiff exclusively and in its own right in the absence of the assignment. But that position does not stand for the other and distinct  position that, though the action is properly brought under the statute, the rules of practice and procedure in this jurisdiction must nevertheless be satisfied, and that involves the sufficiency of the pleadings themselves and the status of the parties to the action.

Before amendment the declaration asserted an implied contract in favor of plaintiff, which was sufficient to cover all items set forth in plaintiff's bill of particulars, whereas the proof discloses that if such contract arose as could be sustained under the common counts as to item 1 of the bill of particulars, it was, in the absence of an assignment, an implied contract in favor of a party other and different from the instant plaintiff. Evidently for the purpose of obviating this difficulty, during the trial the evidence as to item 1 was objected to for the reasons asserted here, and defendant, by motion and the offering of an instruction, tried to have this evidence stricken. But plaintiff, in offering the amendment and the court in permitting the same, caused the declaration

to be amended, not by the filing of a separate or special count, but by making an insertion in the declaration as hereinbefore set out *in extenso.*

The instant amendment was made under Code, 56-4-24, providing for the right to amend a declaration or bill in general, which section provides that plaintiff may have the right to amend his declaration or bill at any time before the appearance of the defendant "and, notwithstanding such appearance, in any action, suit, motion or other proceeding, the court, if in its opinion substantial justice will be promoted thereby, may, at any time before final judgment or decree, and upon such terms as it may deem just, permit any pleading to be amended, * * *." It is the uniform holding in this jurisdiction that independent cf statute, courts of law and equity will show great liberality in permitting amendments to pleadings, and such authority may be exercised whenever justice will be promoted. *Stealey* v. *Lyons,* 128 W. Va. 686, 37 S. E. 2d 569, 574. Likewise it has been the holding of this Court that, while the matter of amendment always rests in the discretion of the Court, *Ratliff* v. *Sommers,* 55 W. Va. 30, 37, 46 S. E. 712, the discretion in trial courts is not absolute, but like every other judicial discretion is subject to appellate review. *Webster* v. *Hurvitz,* 116 W. Va. 328, 180 S. E. 265. So an amendment to a declaration may be made by the insertion in a count of the name of new plaintiffs. *Strader* v. *Goff,* 6 W. Va. 257. But particularly in regard to this case an amendment may be made under Code, 56-4-27, to cure a variance between the pleadings and the proof. This section provides: "If at the trial of any action or motion, there appears to be a variance between the evidence and allegations or recitals, the court, if in its opinion substantial justice will be promoted thereby, may allow the pleadings to be amended to conform to the proof." So, reading Code, 56-4-27, in *pari materia* with the general statute dealing with amendments, Code, 56-4-24, we perceive no error in the trial court's permitting the declaration containing, as it did, the common counts only, to be amended, though the

motion therefor was made after verdict but before judgment was entered thereon. Under the provisions of these two statutes there was no error in the trial court's permitting plaintiff to amend its declaration, though the jury had returned its verdict but judgment had not been entered thereon. The immediate question before this Court does not concern the right of amendment, but the character of the amendment sought to be made. The plaintiff, instead of asserting a special count incorporting the contract of Calhoun and Sammons in the pleadings in this case, undertook to take the short route of amending the common counts. Such amendment is not consonant with good practice and procedure. We say this for the reason that as to the item of $13,922.56, contained in item 1 of the bill of particulars, a defense to that item might be on the basis of a partial payment. In no circumstances should a defendant be required to plead specifically on the basis only of plaintiff's bill of particulars, where a special count is available. The common counts having been the only pleading filed, if there had been alleged payment on the claim of Calhoun-Sammons Coal Company of the amount set forth in item 1 of the bill of particulars, it would be impossible to draw a clear issue on the question whether such payment had, in fact, been made.

In this jurisdiction, notwithstanding the various provisions contained in the Code, the right to plead partial payment or other matters in defense by a special plea or a plea of the general issue accompanied by a notice of particulars has not been abrogated. If in the instant case the assignor had been paid, a matter which is not determined or shown by this voluminous record, could it be said that a party litigant, or his counsel, would be compelled to resort to a mere bill of particulars to determine the incidence of financial or monetary liability. If it is true, as this Court believes, that the right to amend resides in the trial courts of this State, by the same token it is true that the right to permit such amendment does not withhold from counsel the right to know

by pleadings that he must meet the issue which is involved.

It is our opinion, and as counsel for plaintiff in their brief admit, an amendment made by a special count, setting forth the assignment would be proper, because whatever contract is involved, it is fully executed, in which event were it not for the assignment, the plaintiff could have proceeded either on the common counts, a special count, or both. "Where there has been a special contract, the whole of which has been executed on the part of the plaintiff, and the time of payment on the other side is past, a suit may be brought on the special contract, or general assumpsit may be maintained; and in the last case the measure of damages will be the rate of recompense fixed by the special contract." Burk's Pleading and Practice, 3d Ed., page 183.

The whole theory upon which the plaintiff seeks to sustain the jury finding, in the amount of $61,833.16, based upon the testimony of Lucian Sammons, who, in undertaking to establish that figure, used the amounts furnished by the testimony of Willie Gibbs, which resulted in a percentage of 48.947 per cent of 5,700. On this basis the witness, calling the amount as 49 per cent, arbitrarily set the figure at 40 per cent for the purpose of computing the shortage. To reiterate Gibbs' testimony and the calculations made by Sammons, which he used on the basis of Gibbs' testimony, it is asserted that the following items should be taken into account: 1,290 pounds difference in tare in the actual weight of the car; 500 pounds cumulative discrepancy in the scales in weighing a loaded car weighing 6,000; 300 pounds as the result of the tightening and loosening of the rails; and 700 pounds as the result of weighing the car uncoupled from the train, which makes a total, notwithstanding certain discrepancies in this record, of 2,790 pounds. Thus by taking the total figure given by Gibbs of 2,790 pounds, and applying it to the rather arbitrarily established amount of 5,700 pounds, as being the weight of the loaded

coal car, the witness would reach the aggregate of 48.947 per cent of 5,700, which the witness Sammons arbitrarily calls 49 per cent. He then dropped off 9 per cent and used 40 per cent as his multiplier. Of course, under this theory of the case the verdict of the jury depends (1) upon the correctness of the figures furnished by Willie Gibbs; and (2) whether the shortage of at least 40 per cent was constant over the entire period of the stripping operation.

In passing on the question whether the figures furnished by Willie Gibbs, which were adopted by the witness Sammons in determining that there was, in fact, a 40 per cent loss of tonnage, the defendant takes the position initially that plaintiff's own evidence does not prove the loss of tonnage claimed.

This question involves only four figures arrived at by Gibbs as a result of his investigation at the scales located at the head house on the afternoon of September 14, 1948: 1,290 pounds, an alleged excessive tare weight; 300 pounds, alleged to have resulted from the binding of one end of the rail on the mine scales against an end of the mine track rail on the scales; 500 pounds, representing what the witness Gibbs says is "cumulative loss" in weighing 6,000 pounds of coal; and 700 pounds, being the alleged difference in weight of a mine car in train and one uncoupled. These figures, totalling 2,790, as heretofore stated, are the only ones upon which Sammons arrived at the claimed 48.947 per cent of shortage, which he arbitrarily called 49 per cent, and then, dropping off 9 per cent, took as his multiplier 40 per cent of 5,700 pounds, which the plaintiff claims is the weight of a loaded mine car.

In the appraisement of this case on the immediate question, we take Gibbs' testimony as true. There is nothing in this record to gainsay Gibbs' veracity as a witness, in fact, counsel for defendant assume in their brief that Gibbs was a truthful witness; nor is there

anything in this record, which would permit this Court to say that Gibbs, employed as he was as an inspector of weights and measures and having a wide and varied experience in that field of endeavor, was incompetent to arrive at the figures concerning which he testified. His testimony, however, deals only with a certain definite and limited time and with certain definite circumstances. In computing the alleged excessive tare of 1,290 pounds, Gibbs weighed five empty mine cars, and found the average weight thereof to be 3,660 pounds. He then subtracted this figure from the 4,950 pounds, set as the tare weight on the scale beam, and arrived at the allegedly excessive tare weight of 1,290 pounds. His computations are mathematically correct. However, he testified that "There was no accumulation of coal or anything in there", whereas there is strong and uncontradicted evidence in this case that on other occasions heavy accumulations of coal were carried inside the cars, and necessarily these accumulations were repeatedly weighed. This record discloses that the cars were weighed in the fall, that is in September, at a time when the weather was comparatively dry. Necessarily an accumulation of heavy snow on the top of the coal or water soaked into the coal as the result of heavy rains would present different conditions than those under which Gibbs arrived at the tare weight of 1,290 pounds. But because Gibbs' testimony is credible, and the verdict of the jury was in favor of the plaintiff, we must under the rule prevailing in the cases of *Parsons* v. *Railroad Co.*, 127 W. Va. 619, pt. 1 syl., 34 S. E. 2d 334; *Arrowood* v. *Norfolk & Western Railway Co.*, 127 W. Va. 310, 316, 32 S. E. 2d 634; *Adkins* v. *Raleigh Transit Co.*, 127 W. Va. 131, 135, 31 S. E. 2d 775; *Webb* v. *Harrison*, 127 W. Va. 124, 31 S. E. 2d 686; *Boyce* v. *Black*, 123 W. Va. 234 pt. 1 syl., 15 S. E. 2d 588; *Fielder* v. *Service Cab Co.*, 122 W. Va. 522, pt. 1 syl., 11 S. E. 2d 115, take as true that on September 14, 1948, when Gibbs made his investigation, he correctly found the excessive tare weight of 1,290 pounds; that on that occasion one end of the rail was bound to the end of the rail of the mine scales, resulting in 300 pounds weight shortage on each

car; and in a loss of 700 pounds when the loaded mine cars were weighed while coupled in train.

While it is quite difficult to ascertain from Gibbs' testimony how he computed the 500 pounds of alleged "cumulative loss" in weighing 6,000 pounds of coal, he is not contradicted in this regard, and we take as true his testimony on this point. But Gibbs testified only concerning the conditions which existed on September 14, 1948, the day of his investigation.

The foregoing, however, is not of itself determinative of this case on the question whether the jury verdict may stand. In this jurisdiction the burden of proving damages rests upon the claimant, and, when damages can be established with reasonable certainty, the claimant must do so. 5 M. J., Damages, Section 90; *Wiggin* v. *Marsh Lumber Co.,* 77 W. Va. 7, 87 S. E. 194. So it is the duty of the plaintiff to establish by a preponderance of the evidence all provable elements which enter into the quantum of the damages sought to be recovered. As we have said, Gibbs' testimony bears only on the conditions which he found at defendant's head house on September 14, 1948: he knew nothing of, and therefore could not testify concerning, conditions prevailing prior to that time during the tenure of plaintiff's stripping operation, or during any definite part thereof. This witness's only testimony on the question of tare weight on the beam is to the effect that when he arrived at the head house on September 14, 1948, the "thumb screw" was immobile, and that one of the two weighmen who were present pointed to a post where the figure "46" was written, evidently meaning 1946, and said, "That is when the tare weight was set" by the mine superintendent, Kenneth Stafford. Gibbs reached the head house at the end of one shift and about the time that the weighman Rice was replaced by Runyon on the succeeding shift.

Rice, evidently referring to the markings on the post, testified, "Mr. Stafford's initials to it"; that there was no connection between the date and the setting of the

tare on the cars; and further that he made no statement to Gibbs about "weights or anything." Rice testified that the tare was changed from "time to time".

Runyon, the other weighman, testified that the figure on the wall "is the weight of a car", which was marked there by Stafford; that when Stafford became superintendent he asked several of the men concerning the weight of the cars, and received different answers; and that in order to ascertain for himself he weighed two cars, and he (Stafford) "put the date he weighed them, the weight of the cars [4,950] and his initials on the post." This witness further testified that he did not hear anyone make any statement to the witness Gibbs as to the markings on the post, to the effect that the tare had not been changed since Stafford made the markings.

The testimony of Honaker, the general superintendent, and Stafford, mine · superintendent, on the question whether the tare had been changed from time to time on a monthly basis, so as to coordinate the weight on the scales at the head house with the railroad weights, remains uncontradicted in this record.

Likewise the testimony of the two truck drivers, Dick and Courts, who hauled for Sammons Bros. from August 9, 1948, to September 17, 1948, shows a discrepancy for that period averaging about 24 per cent, as against 40 per cent, upon which Sammons based his testimony, is important, not particularly for the purpose of contradicting the accuracy of Gibbs' figures, but as tending to show that conditions differed from those under which Gibbs made his investigation. There is nothing in this record to indicate that the railroad weights were inaccurate, and the evidence to the effect that the tare was from time to time changed, so as to coordinate the two weights, stands out clear and uncontradicted. As we have said, in order for plaintiff to prevail in this case, it must satisfy the second of the two conditions, entering into the quantum of damages, heretofore mentioned, namely, that the shortage of at least 40 per cent, upon

which Sammons based his testimony, was constant over the entire period of the stripping operation, or during any definite and determined period thereof. This being a necessary element for recovery, plaintiff must establish that postulate by a preponderance of the evidence and with reasonble certainty. Difficulty of proof does not take from the claimant seeking recovery, the duty of bearing the burden of proof.

In our opinion, on the question whether the loss testified to by Gibbs occurred at any other definite time or other times during the tenure of plaintiff's strip mining operation, the evidence preponderates in favor of the defendant. So we say that the verdict of the jury on this controlling factual question, being clearly wrong and against the preponderance of the evidence, should be set aside. "A judgment entered by a trial court on a verdict based on conflicting oral evidence, after a motion to set aside the verdict and award a new trial has been made and overruled, may, on writ of error, be reversed and a rew trial awarded, when, in the judgment of the appellate court, the verdict was plainly against the clear preponderance of the evidence." *Burgess* v. *Gilchrist,* 123 W. Va. 727, pt. 3 syl., 17 S. E. 2d 804.

As this case must be remanded for a new trial, we deem it advisable to address ourselves to the other positions asserted by defendant, namely: (1) The contract of January 26, 1948, called for merchantable coal, and the coal mined by plaintiff was to a large extent not merchantable; (2) the monthly settlements made between plaintiff and defendant, evidenced by statements, checks, and vouchers, without objection on plaintiff's part, except as to the coal mined in September, 1948, constituted an accord and satisfaction; (3) the admission, over repeated objections by defendant, of evidence relating to the item of $15,000.00 in the bill of particulars set forth in the building of a road was not cured by the instruction given by the court for the jury to disregard the evidence bearing thereon; and (4) the court's instruction did not cure whatever prejudice there may have

been in the evidence bearing on defendant's failure to mark the weights of its empty mine cars. These points will be considered briefly *seriatim.*

First, was the coal mined by plaintiff merchantable? It is unnecessary to state in detail the evidence bearing on this question, because it is in clear conflict, and, under the rule in *Fielder* v. *Service Cab Co., supra,* and kindred cases, the conflict having been resolved in plaintiff's favor, the defendant would not be entitled to have the verdict set aside on this ground.

We are of opinion that the monthly settlements between the parties do not constitute an accord and satisfaction. "Settled accounts are deemed conclusive between the parties, unless fraud, mistake, or omission is shown." *LeGrand* v. *Hamrick,* 116 W. Va. 572, pt. 1 syl., 182 S. E. 577. Plaintiff had no actual knowledge that the coal mined by it was being weighed incorrectly, as it now complains, until September 16, 1948, and, being in ignorance, under the holding in the *LeGrand* case, its failure to complain from time to time as each settlement was made, and its entry into those settlements without protest, would not serve to bar it on the basis of an accord and satisfaction.

As the evidence bearing on the item of $15,000.00 for building of a road is not relevant to the matters in issue between the parties, the question whether any prejudice resulted from the court's admission of that evidence, though the court instructed the jury to disregard the evidence, is moot because the question will not arise on the remand.

Whether the court's instruction cured the prejudice which may have resulted from evidence bearing on defendant's failure to mark the weights of its empty cars, likewise becomes moot, as it will not arise on the remand.

In passing, however, we suggest that there is no connection between the failure to mark the weights on the

678

cars, as required by Code, 22-2-74 and 75 (the general mining law) and whether the coal stripped by plaintiff and delivered to defendant was inaccurately weighed. Moreover, Code, 22-2, deals with mining operations other than strip mining. As that statute was enacted in 1891, it does not concern strip mining, and neither Chapter 84, Acts of the Legislature, Regular Session, 1939, being the first statute governing strip mining, nor Chapter 85, Acts of the Legislature, 1945, the present statute, relating to regulation and control of strip mining, contain any provision as to the marking of the weights on cars, such as is contained in Code, 22-2-74 and 75, the question is of no importance in this case.

For the foregoing reasons the judgment of the Circuit Court of Cabell County is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*

GIVEN, JUDGE, dissenting:

I agree with the majority holding that a plaintiff may recover upon the common counts on a special contract where the contract has been "fully performed on plaintiff's part, thus giving rise to an antecedent debt", but I do not agree with the holding that the plaintiff in the instant case could not recover as to part of Item 1 of the bill of particulars without a special count in the declaration. Item 1 of the bill of particulars, filed June 3, 1949, trial having commenced October 17, 1949, reads:

"1. Amount owed for 4,350.8 tons of 2,000 pounds each of coal delivered by plaintiff and L. E. Calhoun, doing business as Calhoun-Sammons Coal Company, to defendant from coal stripping operations on property owned or controlled by defendant in Logan County, West Virginia, from September 9, 1947, to January 26, 1948, at an agreed price of $3.20 per ton, said Calhoun having assigned to plaintiff all his interest in such account _____ $13,922.56."

· In effect the majority holding is that there can be no recovery by an assignee except where the claim is pleaded specially, notwithstanding that, even at common law, plaintiff could have recovered under the common counts had there been no necessity for proof that he was an assignee. Was any amendment of the declaration necessary to permit proof of the assignment? I think not. Code, 55-8-9, provides: "The assignee * * * may maintain * * * any action in his own name, * * *. In every such action the plaintiff may unite claims payable to him individually with those payable to him as such assignee, * * *". It will be noted that the statute says the assignee may "maintain" any action, not merely "bring" the action. I think the clear intent of the statute is to permit an assignee to proceed on such a claim, both as to pleading and proof, without regard to the fact that the claim was assigned. In so far as the question of pleading is concerned, of what advantage to an assignee to be able to sue in his own name, and unite claims payable to him individually with those payable to him as assignee, if he be required to plead the assignment specially before offering proof thereof? Of course, if a defendant is not informed as to the nature of the plaintiff's claim, he may be entitled to a bill of particulars, as in other cases.

Assuming, however, that the amendment was necessary to correct the variance between the pleadings and the proof, I think it entirely sufficient. Code, 56-4-27, simply says that "If at the trial of any action or motion, there appears to be a variance between the evidence and allegations or recitals, the court, if in its opinion substantial justice will be promoted thereby, may allow the pleadings to be amended to conform to the proof." Note that such an amendment is not limited to "any action" other than one based on the common counts. Note also that the amendment may be made as to "recitals" as well as to "allegations". Since the majority concedes that recovery of Item 1 could have been had under the common counts if there had been no proof required of the assignment, any necessity for the pleadings to show the

assignment could be only for the purpose of making the pleadings conform to the proof. That would amount to a mere recital of a fact, not the stating of a new or different cause of action. Since all facts contained in the amendment were made known to the defendant long before the trial, I assume there can be no question that the allowance of the amendment, if otherwise permitted, would have promoted "substantial justice". I believe that Code, 56-4-24, not only allows but requires "great liberality in permitting amendments to pleadings", as pointed out by the majority. Why not apply the rule here instead of exploring the law of common law pleading for some superficial technical theory upon which to deny the amendment?

Being unable to reach the same conclusion as the majority with reference to the preponderance of the evidence relating to damages, I believe it necessary to point out certain facts contained in the record, in an effort to make my position clear. There is no dispute as to the price per ton to be paid plaintiff for coal delivered by it to the scales of defendant, or that the scales were operated solely by employees of defendant, or as to the number of mine cars of coal actually delivered defendant by plaintiff, or that all mine cars used in the several operations were of the same capacity. As stated by the majority, the "verdict of the jury depends (1) upon the correctness of the figures furnished by Willie Gibbs; and (2) whether the shortage of at least 40 per cent was constant over the entire period of the stripping operation." Inasmuch as the majority accepts "Gibbs' testimony as true", finds "nothing in this record to gainsay Gibbs' veracity as a witness", and concedes that the jury was justified in accepting Gibbs' testimony as to the 2,790 pounds error in the weight of each mine car of 5,700 pounds of coal constituting the 49 per cent error, those questions need not be considered here. It will be noticed, of course, that the verdict was based upon an error of 40 per cent of the amount of coal for which plaintiff was paid, not 49 per cent.

I do not agree that the average weight of the mine cars of coal delivered was "arbitrarily established" at 5,700 pounds. I believe that fact proven. E. R. Sammons was asked the following questions and answered: "Q. Well, now, I believe you stated a minute ago that you did check the weigh sheets that were furnished by the Elk Creek Coal Company over this entire period compared with the amount you were being paid for the coal. What was the average load per mine car on those? A. The average was about 5,700 pounds. Q. Any cars loaded more than 5,700 pounds? A. I am not sure, I would get the total and divide by the number of cars we had, that is, they showed an average of 5,700 pounds. We loaded our cars heavier all the time, as much as we could get on them. If we had a car it was to our advantage to get as much coal as possible on that car and get it weighed. Q. Was there any change in this average from the beginning of the operation to the end of the operation? A. No, sir, there was not." Lucian R. Sammons testified: "They would weigh something between five and six thousand pounds. I would say they averaged close to 5700 pounds." F. C. Sammons was asked the following questions and answered: "Did you see any weights on the weight sheets? A. Yes, they gave me the sheets. Q. What did these weights average? A. Each day if you would take a day's work, that didn't add up—a hundred cars which was about a maximum—add them and they would not vary from 5,700 very much. Q. A little over sometimes? A. Sometimes 25 less, sometimes over. Q. Now, did you notice any difference in weights at the beginning of the check, or at the end of the check? A. Not any change. Q. About the same throughout the period, is that right? A. That's right." This average weight is, in effect, admitted by H. R. Honaker, defendant's witness and general superintendent, who stated: "The deep mine job would average 2.4, and the strip coal from the Sammons Brothers strip would go possible 3 tons, 2.9." Frank Rice, defendant's witness and weighman, who operated the scales for defendant during the larger part of plaintiff's operation, was asked and answered: "Q. Did

they weigh the same throughout the whole period that you were weighing them? A. Yes, sir."

As to the error of 1,290 pounds per mine car of coal due to the weight on the tare being set at 4,990 pounds instead of 3,660 pounds, Gibbs testified: "I inquired of the weighman as to when the tare weight of the cars was set, the way I recall it, and he pointed on the wall to the figure of 46, meaning 1946. He said, 'That is when the tare weight was set.' I inquired as to who set the tare weight, and he said the mine superintendent." I assume that the majority also accepts this testimony of Gibbs as true. However, he is corroborated by other witnesses. Arlie Runyon, defendant's witness and weighman, stated, with reference to the figure "46" written on the wall: "That was the year the weight was put there." This witness of defendant was asked the following questions and answered: "Mr. Runyon, on those weights on the scales, were they the same throughout the whole period that Sammons Brothers Construction Company was loading coal and dumping it there at the headhouse, did the scale run about the same throughout the whole period? A. You mean the weight? Q. Yes, sir, about the same throughout the whole period? A. Yes, sir, it did. Q. No change before or afterwards, is that what you say? A. No, sir, there wasn't. Q. Just hasn't been any change? A. The weight you mean? Q. Just about the same all the way through? A. Yes, sir." Thus we have the positive statement from defendant's own weighman that the tare weights remained the same throughout the entire period of plaintiff's operation. Mr. Rice, another weighman of defendant, who had been employed by the company since 1938, and who was present at least part of the time while Gibbs was testing the scales, was asked, and answered: "Now, I believe you stated that Mr. Stafford changed the tarebeam from time to time, is that right? A. No, not from time to time; he changed it once or twice while I was there." This is in direct conflict with other evidence of defendant to the effect that the tare weight was changed each month

to correct differences in the weights shown by the scales and the weights shown by the records of the shipping railroad company, and clearly supports plaintiff's position that the tare of 4,950 pounds was deducted from the weight of each mine car throughout the entire period of plaintiff's operation. A representative of the manufacturer of mine cars used by defendant testified that the cars weighed on the average a little more than 3,900 pounds, but further testified that such cars would weigh considerably less after being used for some length of time, due to rust and wear. The larger number of the cars used by defendant had been used for approximately ten years.

Of the 2,790 pounds error found by Gibbs, an error of 700 pounds was the result of the weighing of each car in train instead of uncoupling and weighing each car separately. That this practice existed throughout the operation of plaintiff seems perfectly apparent. Defendant's position at the trial was that the practice was the usual and accepted practice of weighing mine cars of coal, and that no error could have resulted from such practice. This, I think, amounts to a clear admission, or at least there is a clear inference, of such continued practice on the part of defendant. Of the error found by Gibbs, 300 pounds per mine car was the result of the binding effect of the rails attached to the scales with rails leading onto the scales. This condition, according to Gibbs, was corrected when the ends of the rails were shortened. The jury had the right to conclude, from these physical facts, that the rails would not have been lengthened from such continuous friction and that, therefore, such friction had existed throughout plaintiff's operation, and the defendant, although having had complete possession and control of the scales, did not attempt to show otherwise. These conclusions, however, do not depend upon inferences, as will be shown later. The three errors mentioned, 1,290 pounds false tare, 700 pounds as to the weighing of each car in train, and 300 pounds as the result of the binding rails, constitute more than a 40 per cent error in the

weight of a car of coal of 5,700 pounds, and, in the aggregate, more than the amount of damages allowed plaintiff by the jury. There was a further cumulative error, however, testified to by Gibbs, of 500 pounds in each 6,000 pounds of coal weighed, due to mechanical defects in the scales. This 500 pounds error is, I think, clearly established not only by plaintiff's witnesses but by defendant's own witnesses. Stafford, defendant's mine superintendent, testified that he placed a fifty pound weight "on the scales easy and it only weighed about forty pounds". This would show a greater error than testified to by Gibbs. Ray Watts, Logan County Sealer of Weights and Measures from 1936 to 1944, testifying for defendant, stated: "* * * I inspected those scales at regular intervals, I would say they were 90% perfect all the time, I was Sealer of Weights and Measures." The 10 per cent error was greater than the cumulative error testified to by Gibbs. Other evidence, I think, strongly supports the jury finding that a shortage of at least 40 per cent "was constant over the entire period" of plaintiff's operation.

Almost from the beginning of the operation, plaintiff complained that it was not receiving payment for the amount of coal delivered. It was at first believed that the shortage was due to a mistaken practice or method of identifying or separating mine cars hauling plaintiff's coal from mine cars hauling coal from defendant's deep mining operations. E. R. Sammons testified that they started complaining about shortages "right after Sammons Brothers Construction Company alone started." L. R. Sammons was asked as to this and stated that he went to the office of defendnat "every two or three weeks" and talked with Mr. Davis concerning the matter. Other witnesses testified to the same effect. At least two witnesses testified that officers of defendant company stated, in effect, that no tare was being deducted, meaning, of course, no tare over and above the actual weight of the empty mine cars. After plaintiff had contracted the trucking of the coal to the scales, the truckers being paid on a tonnage basis, a number of tests were made to es-

tablish the capacity of the trucks used in the hauling, and, when considered with the number of truck loads of coal hauled, a complete record thereof having been kept, clearly indicated that plaintiff was delivering more coal to the scales than it was being paid for. Some of these tests showed more than a 40 per cent shortage in the coal credited to plaintiff.

Witnesses of plaintiff testified to the effect that the trucks used by plaintiff before the hauling was contracted were of approximately the same size as the trucks used by Dick and Courts. Witnesses also testified to the effect that the trucks could not have been loaded any fuller, and that the trucks were "loaded to capacity". A number of witnesses testified to the effect that plaintiff delivered only "clean" coal, and it is certain that defendant's inspectors were at the mining operation of plaintiff for the purpose of seeing that only clean coal was delivered. There is no denial that defendant furnished plaintiff with statements showing the number of tons of coal for which plaintiff was paid. As pointed out above, there is abundant evidence to establish that the average weight of the coal of each mine car was 5,700 pounds. These facts, in my opinion, clearly warranted the jury in finding, as it necessarily did, that the practice and conditions under which the coal was weighed at the time Gibbs tested the scales existed throughout the period of plaintiff's operation and that, therefore, the error in the weighing of the coal delivered by plaintiff amounted to at least 40 per cent of the coal for which plaintiff was paid. In *Hurxthal* v. *St. Lawrence Boom & Mfg. Co.*, 65 W. Va. 346, 64 S. E. 355, the Court laid down the rule that: "A verdict depending wholly on conflicting oral testimony of witnesses in the presence of the jury will not be set aside on the sole ground that it is against the weight and preponderance of such evidence. The jury's province to judge the credibility of such witnesses cannot be so invaded." Point 1, syllabus.

I think the majority considers some of defendant's evidence as controlling when it is strongly contradicted. De-

fendant's principal contention is that even though the scales were in error an adjustment was made each month so as to "coordinate" the weights shown by the scales with the weights shown by the shipping railroad company. The effect of that would be to disregard the weights shown by the scales, which is not what the parties contracted should be done. Such an adjustment, however, was impossible, because of the fact that the coal from the S. P. B. strip mining operation, an operation four times larger than that of plaintiff, was not weighed, but merely estimated; and for the further reason that the slate and other impurities were removed from the coal produced from the several operations after the coal mined by plaintiff had been weighed and intermingled with the coal from the other operations, such impurities not having been weighed, or the weight thereof even estimated. Defendant also contends that the tare of 4,950 pounds was justified by the large amount of slate and other impurities in the coal delivered by plaintiff, yet Stafford, defendant's mine superintendent, testified: "Q. Who handled this matter of adjusting the scale weights to the railroad weights and who gave you the figures then to use in changing the tare weights on the scale beams? A. Mr. Honaker, he always gave me the figures to change. He would say to add twenty pounds, twenty-five pounds; I don't think I ever knew it to go over 160 pounds. Q. Well, was it always large, what do you mean by that, would the scale weights always go under the railroad weights, or sometimes under and sometimes over? A. Sometimes be the other way; sometimes you would take off." Defendant further contends that heavy accumulations of coal remained inside the mine cars after they were emptied, making the additional tare necessary. But it was clearly shown that each mine car was emptied by being automatically overturned; that automatic hammers were operated to prevent any such accumulations; and that employees of defendant removed any coal remaining after the cars were overturned. It seems perfectly apparent that if any reasonable part of the 1,290 pounds of tare added to the actual weight of

each empty mine car resulted from either of the circumstances contended for by defendant, the weights shown by the scales could not possibly have so nearly equaled the weights shown by the records of the railroad company, as contended by defendant. In view of this evidence it could hardly have been expected that the jury would find that the defendant's operations were so inefficient as to have permitted such accumulations to be transported back and forth in its mine cars. That would have reduced the amount of coal that could have been marketed, for all agree that defendant then had an insufficient number of mine cars to properly serve the several operations.

Defendant contends that the 1,303 truck loads of coal delivered by Dick and Courts, or 11,401 tons, averaging the truck loads at 8-¾ tons, as against 8,612 tons, the amount of coal actually paid for, shows an error of 2,789 tons, and only a 24 per cent shortage. But 2,789 tons are 24 per cent of 11,401 tons, the amount of coal claimed to have been delivered, not the amount paid for by defendant. Some of the evidence indicated that the trucks hauling coal would average, on the short hauls to the scales of defendant, more than nine tons. Therefore, if the jury used that weight, as it was entitled to do, the shortage as to the coal paid for would be approximately 40 per cent.

In cases of this type it is not necessary that damages be established in an exact amount. "Our decisions say that in such cases absolute certainty as to the amount of damages is not required but that reasonable certainty only is necessary, and that substantial damages may be recovered, though the loss can be stated only approximately. *Hurxthal* v. *Boom Co.,* 65 W. Va. 346; *Manss-Owens Co.* v. *H. S. Owens & Son,* 129 Va. 183." *Reiser* v. *Lawrence,* 96 W. Va. 82, 89, 123 S. E. 451.

Being of the opinion that the action of the trial court in allowing the amendment to the declaration was not error, and that this Court has invaded the province of the jury, I respectfully dissent.